**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**              **Case 2:22-cr-20154-JTF**

**IAN HERRON,**

      **Defendant.**

**REPORT AND RECOMMENDATION ON**
**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Before the Court is Defendant Ian Herron's Motion to Suppress Evidence.  (Docket Entry ("D.E.") #27).  The instant motion was referred to the United States Magistrate Judge for Report and Recommendation.  (D.E. #28).  The Magistrate Judge held a hearing on the instant motion on February 7, 2023.[1]  For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress Evidence be GRANTED.

---

[1]  Defendant's Motion to Suppress challenges both whether the search warrant was supported by probable cause and whether subsequent statements made by him during a custodial interrogation were lawfully obtained.  As to whether the search warrant was deficient, Defendant raises only facial challenges that must be resolved by reviewing the information contained within the four corners of the warrant affidavit.  Thus, the hearing on the instant motion pertained solely to the issues relating to Defendant's post-arrest statements.

## I.  Background

### *a.  Indictment*

On June 30, 2022, a grand jury of this Court returned a four-count Indictment against

Defendant charging him with committing the following offenses on or about July 6, 2021:

> Count One:  unlawfully, knowingly, and intentionally possessing with the intent to distribute a controlled substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);
>
> Count Two:  knowingly possessing a firearm, that is, a Ruger .44 caliber revolver handgun, in furtherance of a drug trafficking crime in violation of Title 18, United States Code, Section 924(c)(1)(A);
>
> Count Three:  knowingly possessing a firearm, that is, a Ruger .44 caliber revolver, while knowing that he had been convicted of a crime punishable by imprisonment for a term exceeding one year, said firearm having been shipped and transported in interstate commerce, in violation of Title 18, United States Code, Section 922(g)(1).
>
> Count Four:  knowingly possessing a firearm, that is, a F.I.E. Titan Tiger .38 caliber revolver, while knowing that he had been convicted of a crime punishable by imprisonment for a term exceeding one year, said firearm having been shipped and transported in interstate commerce, in violation of Title 18, United States Code, Section 922(g)(1).

(D.E. #1).

On January 22, 2023, Defendant filed the instant Motion to Suppress Evidence.  Therein,

Defendant requests that this Court suppress all "evidence seized during and after an arrest,

interrogation, and the service of a defective search warrant, including without limitation all

statements attributed to Mr. Herron and all evidence seized and all evidence subsequently obtained

as a result of that seizure."  (Def.'s Mot. at Suppress at PageID 31).

As bases for the suppression, Defendant argues that the Search Warrant was not supported

by probable cause and that no reasonable officer could have believed in good faith that it was a

valid search warrant.  Additionally, he argues that the Government has not met its burden of

proving that he knowingly, voluntarily, and intelligently waived his rights. Specifically, Defendant asserts that Detective Young did not inquire about his mental state or capacity, did not inquire about his ability to read or write, and did not inquire as to whether he was under the influence of controlled substances despite the alleged offense being narcotics related.

In its Response, the Government contends that the Search Warrant was supported by probable cause and that, even if it were found to be lacking in probable cause, it was relied upon in good faith pursuant to *United States v. Leon*, 468 U.S. 897 (1984). The Government further asserts that Defendant's *Miranda* waiver was voluntarily, knowingly, and intelligently made.

Following the hearing on the instant motion, both Defendant and the Government submitted post-hearing briefs on the applicability of *United States v. Antwone Sanders*, Case No. 21-5945 (6th Cir. Feb. 6, 2023), which was decided by the Sixth Circuit on the day prior to this hearing being held. Defendant argues that the *Sanders* decision is highly analogous and should guide the result here. The Government argues that the Search Warrant in this case contained greater indicia of probable cause such that the totality of the circumstances supported its issuance by the magistrate and the good faith reliance thereupon by the officers who executed it.

## II.     Proposed Findings of Fact

### a. *Residential Search Warrant*

On July 2, 2021, Detective Stephen Young ("Detective Young") of the Shelby County Sheriff's Office ("SCSO"), Narcotics Division, sought a search warrant for the person of Defendant and a residence located at 3316 Bestway Drive, Memphis, Tennessee, 38118 (the

"Residence").[2]  (D.E. #27-1, #30-1).  The Affidavit for Search Warrant ("Affidavit") stated that it sought to locate fentanyl, marijuana, drug paraphernalia, drug documents, drug proceeds, and electronic storage devices.  (*Id.*)  Therein, Detective Young provided the following information.

In June 2021, detectives with the SCSO Narcotics Division received information from a confidential source ("CS") that a black male by the name of Ian Herron was selling narcotics in the Memphis, Shelby County, Tennessee area.  (D.E. #27-1 at PageID 43; D.E. #30-1 at PageID 70).  Using law enforcement databases, detectives were able to positively identify Defendant through the use of photographs that were provided to the CS.  (*Id.*)  The CS additionally "provided information to Narcotics Detectives that has been verified independently and resulted in two felony narcotics seizures."  (*Id.*)

The CS advised detectives that Defendant had been selling fentanyl from "his residence" located at 3316 Bestway Drive in Memphis, Tennessee.  (*Id.*)  Detectives conducted intermittent surveillance at the Residence, during which time they observed Defendant "sit in the front seat of a white Chevrolet Impala with numerous unknown subjects at the residence."  (*Id.*)  They also observed that Defendant would "briefly enter the residence and encounter the unknown individuals resulting in the unknown subjects leaving the residence shortly thereafter."  (*Id.*)  Detective Young stated that, based upon his three-and-a-half years of law enforcement experience, he was aware that these types of encounters and exchanges are consistent with narcotics trafficking.  (*Id.*)

Detectives additionally relied upon the CS within five days of July 2, 2021 to perform probable cause ("PC") buys from Defendant at 3316 Bestway Drive, where SCSO narcotics funds were exchanged for fentanyl.  (*Id.*)  Detective Young further stated that, "[t]hrough training and

---

[2]  For purposes of this motion, the term "Residence" will be used to refer to the interior of the home located at 3316 Bestway Drive in Memphis, Tennessee.  The term "Premises" will be used to refer to all other areas on the property, including the unspecified location where the Chevrolet Impala was parked.  The address 3316 Bestway Drive will refer to the entire property, including both the Residence and the Premises.

experience[,] drug dealers are known to keep drugs, drug paraphernalia, drug documents and drug proceeds inside their residence."  (*Id.*)

On that same day, a search warrant (the "Search Warrant") was issued for the person of Defendant Young and the Residence.  (D.E. #27-1 at PageID 41; D.E. #30-1 at PageID 68).  The Search Warrant was returned executed on July 6, 2021.  (D.E. #27-1 at PageID 42; D.E. #30-1 at PageID 69).  The Search Warrant return information indicates that officers obtained 177 grams of fentanyl, 75 grams of THC gummies, a digital scale, two (2) firearms, and "assorted ammo."  (*Id.*)

### b.  *Detective Stephen Young's Testimony and Hearing Exhibits*

At the hearing on the instant motion, Detective Young testified as the case agent regarding the execution of the Search Warrant for the Residence, the detention of Defendant, and his subsequent questioning.

Detective Young stated that between six and eight law enforcement officers were present at the search of the Residence.  Detective Young encountered Defendant at the Residence, at which point he was handcuffed and detained in an unmarked car while the search was performed.  The search itself lasted approximately thirty to thirty-five minutes.  While Defendant was detained, Detective Young advised him that they had a search warrant for the Residence and that he was the target of the investigation.  Detective Young did not advise Defendant of his *Miranda* rights at that time and did not ask him any questions or try to elicit any information from him.

Defendant was then transported to an SCSO office, which took approximately ten minutes.  When he arrived, Detective Young advised Defendant of his *Miranda* rights as he entered the building.  Detective Young did so by reading the *Miranda* warnings from the SCSO advisory form, which is his standard procedure.  Detective Young also has the individual sign an SCSO Narcotics

5

Division Miranda Rights Advisement / Waiver Form ("Rights Waiver Form"), which Defendant

did. (*See* D.E. #30-2). The Rights Waiver Form states as follows:

> You are going to be asked some questions regarding this investigation. You have
> the right to remain silent and anything you say [may] be used against you in a court
> of law. You have the right to have a lawyer present, either of your own choice, or
> court appointe[d. If] you are unable to afford one, and to talk to your lawyer before
> answering any questions, and to have a lawyer with you duri[ng] questioning if you
> wish.

(D.E. #30-2). It further asks two questions: "Do you understand each of these rights I have

explained to you?" and "Having these rights in mind, do you wish to answer questions at this

time?" (*Id.*) Both questions have handwritten responses of "Yes IH." The form appears to be

signed by Defendant and two witnesses. (*Id.*)

Defendant was next taken to a holding cell and then to an interview room. In the interview

room, Defendant was again advised of his *Miranda* rights, and this advisement of rights was audio

recorded. (Feb. 7, 2023 Hearing, Exhibit 1, at 0:00:00-0:01:18). During this recorded reading of

his rights, Detective Young stated that he had already advised Defendant of these rights previously.

(*Id.*) Detective Young asked Defendant to acknowledge that, but his response on the audio

recording is unintelligible. (*Id.*) Detective Young then asked if Defendant wished to answer

questions at that time. (*Id.*) His response is again unintelligible, although one detective mentions

that Defendant was "shaking his head." (*Id.*) Detective Young testified, though, that he recalls

Defendant indicating that he wished to speak to him and Detective Towns. Detective Young

testified that Defendant did then speak with then, and the audio recording reflects the same. (*Id.*

at 0:01:18-0:17:46). Detective Young testified that he does not believe that Defendant asked any

questions about his *Miranda* rights but that, if he had, he would have answered them. At no time

did Defendant state that he wished to stop speaking with them. (Feb. 7, 2023 Hearing Transcript,

Exh. 1, at 0:00:00-0:17:46).

6

Detective Young did not ask Defendant if he could read or write, if he was under the influence of any controlled substance, or if he had any mental health history. Detective Young testified that Defendant "seemed pretty normal," did not ask any questions about where he was or what was happening, did not appear confused, and responded in a straightforward and responsive manner. Detective Young testified, however, that he had never met Defendant before and did not have any baseline for his behavior.

Detective Young testified that the interview lasted approximately fifteen to twenty minutes; the audio recording reflects that it lasts seventeen minutes and forty-seven seconds. Detective Young did not prepare a written statement to be signed by Defendant, but, instead, relied upon the audio recording of the interview. Detective Young concluded the interview at that time and does not recall engaging in any further conversations with Defendant.

### III.     Analysis

#### a.     *Whether the Search Warrant was Supported by Probable Cause*

The Fourth Amendment guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U. S. Const. amend. IV. The task of a magistrate from who a warrant is sought is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal quotation marks omitted).

"The critical element of a reasonable search is . . . that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought." *Zurcher v. The Stanford Daily*, 436 U.S. 547, 556 (1978) (internal quotation marks omitted). This is typically referred to as the "nexus" between the place to be searched and the evidence desired to be found. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2003). This connection between the evidence and the criminal activity must be "specific and concrete, not 'vague' or 'generalized.'" *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2013) (quoting *Carpenter*, 360 F.3d at 595).

If the affidavit includes hearsay from a confidential informant, the reviewing court "must consider the veracity, reliability, and basis of knowledge for that information as part of the totality of the circumstances for evaluating the impact of that information." *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003). These three elements should not be understood as entirely independent requirements to be rigidly exacted in every case. *United States v. Smith*, 358 U.S. at 477-478 (citing *Gates*, 462 U.S. at 230). Instead, they should be understood as closely intertwined considerations that may inform the determination of whether an informant's tip establishes probable cause. *Id.*

In assessing the reliability of a confidential informant's tip, a deficiency in one of these areas generally may be compensated for by a strong showing as to the other, or by some other indicia of reliability. *Smith*, 358 U.S. at 478 (citing *Gates*, 462 U.S. at 233). However, there is one requirement that the Sixth Circuit has held must be met to rely upon a confidential informant's tip without independent corroboration, and it pertains to the informant's basis of knowledge that evidence will be found at the place to be searched. Specifically, "[w]hen an informant has a proven track record for providing reliable information, corroboration of the information he provides is not

necessarily essential, *as long as there is sufficient indication of his basis of knowledge for concluding that contraband or evidence of a crime will be found in a particular place*." *Smith*, 182 F.3d at 479 (italics added); *see also Draper v. United States*, 358 U.S. 307, 313 (1959).[3]

Although reasonable minds may differ on the question of whether an affidavit establishes probable cause, reviewing courts should afford the issuing magistrate's determination "great deference," *United States v. Leon*, 468 U.S. 897, 914 (1984) (citation omitted), "an issuing magistrate's decision should only be reversed if it was arbitrarily exercised," *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (citing *United States v. Swihart*, 554 F.2d 264, 270 (6th Cir. 1977)).   The review of whether a warrant was supported by sufficient evidence is limited to the four corners of the affidavit, *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010), and it "must be judged based on the totality of the circumstances, rather than line-by-line scrutiny," *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006).   Ultimately, the Government bears

---

[3]  The facts presented in affidavits as to the reliability and veracity of confidential informants vary widely.   Some affidavits provide boilerplate language that a confidential informant has given information on occasion or occasions regarding violations of law that were found to be accurate and reliable.   *See e.g. United States v. Weaver*, 99 F.3d 1372 (6th Cir. 1996).   Others provide significant evidence of a long-standing relationship with confidential informants providing evidence of the specific violations of law at issue in the application for search warrant, many of which have resulted in convictions.   *See, e.g.*, *McCray v. Illinois*, 386 U.S. 300, 302-04 (1967); *Smith*, 183 F.3d at 478-79.

In *Smith*, the informant had provided information relating to narcotics and/or firearms violations on at least twenty-six occasions, several of which resulted in felony convictions.   183 F.3d at 478-79.   Under these circumstances, he was found to be an informant of "unusual reliability," which on its own substantiated his veracity.   *Id.*   The *Smith* court relied upon *McCray*, which likewise found that an informant was necessarily reliable because he had provided accurate information about narcotics activities fifteen or sixteen times resulting in numerous convictions.   386 U.S. at 302-04.

The Affidavit here states that the CS provided information that was verified independently and has resulted in two felony narcotics seizures.   The fact that the CS assisted with narcotics cases weighs in favor of his reliability, as he "had previously provided reliable information in regard to the same illegal conduct that was the subject of the warrant." *Smith*, 182 F.3d at 479.   Even so, the CS does not have the "unusual reliability" of the informants in *Smith* and *McCray*. However, even assuming, *arguendo*, that his assistance with the two felony narcotics seizures is sufficient to establish a "proven track record" such that his veracity and reliability is well-established, there still must be a "sufficient indication of his basis of knowledge for concluding that contraband or evidence of a crime will be found in a particular place." *Smith*, 182 F.3d at 479.   The Court will analyze whether the Affidavit sufficiently set forth the CS's basis of knowledge, *infra*.

the burden of demonstrating that a warrant is supported by probable cause.  *United States v. Abboud*, 438 F.3d 554 (citing Fed. R. Crim. P. 41(c); *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996)).

### i.   *Hearsay Information from CS*

Here, the Affidavit begins by setting forth the information provided by the CS.  The Affidavit states that the CS advised that Defendant was selling fentanyl from "his residence" at 3316 Bestway Drive and that the CS was able to identify Defendant based upon a photograph provided to him.  It further states that, at some point, the CS provided information that was verified independently and resulted in two felony narcotics seizures.

The inclusion of evidence that the CS has assisted in two felony narcotics seizures provides support for the veracity and reliability of the informant, particularly as the assistance pertained to narcotics investigations.  There is no evidence in the Affidavit, however, as to the CS's basis of knowledge that Defendant resides at 3316 Bestway Drive or that Defendant is selling fentanyl from 3316 Bestway Drive.  While the Affidavit is not required to include the basis of the CS's knowledge regarding every piece of information he provides so long as he is found to be sufficiently reliable, it is required under *Smith* to include some basis of knowledge for concluding that contraband or evidence of a crime will be found in a particular place, as this is the critical question for determining whether a warrant should be issued to search that location.

Accordingly, to establish probable cause, there must be corroborating evidence that establishes that probable cause that contraband or evidence of a crime will be found within the Residence.  *See United States v. Sanders*, 59 F.4th 232, 239 (6th Cir. 2023) (stating that, in the absence of evidence of a confidential informant's veracity, reliability, or basis of knowledge, it may still found to be based upon probable cause if it includes sufficient corroborating information

from investigative measures such as surveillance and controlled drug purchases); *United States v. Woolsey*, 361 F.3d 924, 927 (6th Cir. 2004) (same); *United States v. Howard*, 632 F. App'x 795, 804 (6th Cir. 2015) (stating that what an informant and his tip "lack in intrinsic indicia of credibility, however, police must make up for in corroboration"); *United States v. Bell*, No. 20-1884, 2022 WL 59619, at *3 (6th Cir. 2022) (citing *Smith*, 182 F.3d at 479-81) (acknowledging that, when the affidavit lacks information about, *inter alia*, an informant's basis of knowledge, it may still suffice if probable cause is established by other statements therein, including by "an officer's independent investigative work corroborating the [confidential] informant's tip").

### ii. SCSO Investigation

Turning to the investigative efforts that occurred in response to the CS's information, the Affidavit states that SCSO detectives began by performing "intermittent surveillance."[4]  During their surveillance, SCSO detectives observed that, on numerous occasions, the following would occur:  (1) Defendant would sit inside a vehicle on the Premises while numerous unknown individuals were present; (2) Defendant would briefly enter the Residence and encounter the unknown individuals; and, (3) the unknown individuals would leave the Residence shortly thereafter.

SCSO detectives also confirmed that Defendant was selling fentanyl by utilizing the CS to perform an unknown number of "probable cause (PC) buys" within the five days prior to seeking

---

[4] The Affidavit does not state when the intermittent surveillance occurred.  It does state that the CS advised that Defendant was selling fentanyl in June 2021 and that the Affidavit was submitted on July 2, 2021. While the Affidavit reads as if the intermittent surveillance occurred between those dates, Defendant correctly notes that the Affidavit does not clarify that the surveillance efforts did not pre-date the CS's information.  In any event, even assuming, *arguendo*, that the intermittent surveillance was performed in June or July of 2021, for the reasons set forth, *infra*, it is RECOMMENDED that the Affidavit nonetheless fails to set forth a sufficient nexus between the evidence sought and the place to be searched.

the Search Warrant.  These purchases occurred at "3316 Bestway Drive," but there is no evidence as to whether they occurred inside the Residence or merely on the Premises.

Overall, the evidence gleaned from the investigation corroborates the CS's broad statement that Defendant sells fentanyl from 3316 Bestway Drive.  It confirms that Defendant has other connections to 3316 Bestway Drive such that he comes and goes from inside the Residence, interacts with other individuals observed to be at the Residence, and spends time sitting in a vehicle parked outside of it.  Even so, the Affidavit does not contain evidence of any further connection between Defendant and the inside of the Residence itself, including whether he owns or rents the Residence, whether he stays or resides there, whether the utilities are registered in his name, whether Defendant received mail there, whether his vehicle is registered there, or whether other records list the Residence as Defendant's address.[5]

Additionally, the Affidavit does not contain any evidence that Defendant sells fentanyl or other illegal narcotics from inside the Residence or that he stores fentanyl or other narcotics, drug paraphernalia, drug documents, drug proceeds, or any other personal property inside the Residence.  Thus, in addition to having no basis for finding that Defendant resides there, the Affidavit provides no nexus between the Residence and the sale or storage of illegal drugs therein.

Further, while the Affidavit states that the types of encounters that were observed by SCSO detectives are consistent with narcotics trafficking, they are also consistent with a wide range of non-criminal social activity.  The totality of the circumstances analysis must take into account common-sense "considerations of everyday life" in determining whether a there is a fair probability that evidence of a crime would be found at a certain location.  *See Gates*, 462 U.S. at

---

[5] Because there is no independent corroboration for the CS's statement that the home located at 3316 Bestway Drive is Defendant's residence, it renders irrelevant Detective Young's statement that, based upon his training and experience, "drug dealers are known to keep drugs, drug paraphernalia, drug documents and drug proceeds at *their* residence."

238; *Frazier*, 423 F.3d at 531.  The Sixth Circuit has specifically held that a defendant's "entering and exiting of a [residence], alone, provides no indication of criminal activity in the [residence]." *United States v. Sanders*, 59 F.4th 232, 239 (6th Cir. 2023); *see also United States v. Savoca*, 761 F.2d 292, 297 (6th Cir. 1985) (reasoning that a suspect's mere presence at a residence is too insignificant a connection with that residence to establish that relationship necessary to a finding of probable cause).  Further, the Affidavit does not state that any of these encounters between individuals coming in and out of the Residence included any hand-to-hand transaction or exchanges of any type.  Thus, even if the activities at 3316 Bestway Drive were deemed to be highly suspicious based upon the CS's information, it does not constitute "reliable evidence connecting . . . ongoing criminal activity" with the Residence.  *Brown*, 828 F.3d at 383; *McCoy*, 905 F.3d 409, 418, n.5 (6th Cir. 2018).

### iii.  Review of Magistrate's Probable Cause Determination

Based upon the foregoing, it is possible to distill the question before the Court down to the following:  if the Affidavit sets forth that Defendant is believed to be selling illegal drugs from the Premises but does not specify that Defendant is believed to be selling illegal drugs from inside the Residence, and if it further sets forth that the only other connections between Defendant and the Residence are that he enters and exits it and encounters individuals there who leave soon after, does probable cause exists to issue a warrant to search inside the Residence?

There are countless cases within this Circuit that have grappled with the fact-specific inquiry into whether the requisite nexus exists.  They can be categorized into at least two overarching categories.  The first are cases where the known or suspected drug dealer resides at the location to be searched.  *See, e.g., Brown*, 828 F.3d at 383-84 & n.2 (citing cases); *Frazier*, 423 F.3d at 533.  In these, which the Court will refer to as having a "residency-focused nexus,"

the drug dealer's residency is the central element of the probable cause determination. The second are cases where the known or suspected drug dealer does not reside at the location but there is evidence of drug-related activities at the location. *See, e.g., Brown,* 828 F.3d at 382-83. In these, which the Court will refer to as having an "activity-focused nexus," the evidence regarding what drug-related activities are believed to be occurring at the place to be searched must be far greater, as the drug dealer's residency does not already contribute to the weight of evidence needed to establish probable cause. The task here is to determine whether this Affidavit suffices to establish any such nexus.

To establish a residency-focused nexus, there must be either "overwhelming evidence that the defendants were major players in a large, ongoing drug trafficking operation," in which case little to no other evidence is required for a search of the drug dealer's residence, or that the drug dealer resides plus "some reliable evidence connecting the known drug dealer's ongoing criminal activity." *Id.* While this Affidavit does express some belief that Defendant resided at the Residence, absent any corroboration that he does in fact reside there, the Affidavit cannot establish probable cause under a residency-focused nexus.[6]

---

[6] Because the CS does not provide his basis of knowledge that Defendant resides at 3316 Bestway Drive and Defendant's residency is not corroborated, this case is practically more analogous to cases in which the affidavit admits that the suspected drug dealer does not reside at the place to be searched than it is to those where residence is squarely established.

For example, in *United States v. Anthony Cornelius Baylis*, No. 3:08-CR-147, 2009 WL 454334 (Feb. 23, 2009), the court considered the "unusual" case where the affidavit affirmatively stated that the suspected drug dealer did not live at the residence sought to be searched; instead, the affidavit stated that he was believed to frequent it and sell crack cocaine from inside it. *Id*. at *13. The *Baylis* court held that, when the affidavit does not demonstrate probable cause to search the home based upon a suspected drug dealer's residence there, there must be "some additional assurance" that contraband or evidence of criminal activity would be found there. *Id.* at *14. The *Baylis* court further concluded that there was no evidence that the defendant kept or stored drugs there. *Id*. Thus, the *Baylis* court determined that the affidavit failed to meet the nexus requirement to establish probable cause. *Id*.

14

If the Affidavit were to establish an activity-focused nexus between the Residence and the evidence sought, it must clearly detail what illegal drug activities were occurring there.  There are several common scenarios that provide an activity-based nexus.   One is when there is evidence that narcotics are being sold from inside the residence.[7]  Another is when the residence is visited shortly before and/or after verified narcotics sales by the person known to be selling the narcotics. Yet another is when there is probable cause that the narcotics, drug paraphernalia, drug documents, and/or drug proceeds are stored inside the Residence.[8]  *See, e.g.*, *Brown*, 828 F.3d at 383-84; *Sanders*, 59 F.4th at 238.

Here, the Affidavit does not state that either the CS advised that narcotics sales occurred inside the Residence or that officers were aware of probable cause buys or any other narcotics sales taking place inside the Residence.  While the Affidavit does set forth that Defendant would briefly enter the residence and encounter unknown individuals who left shortly thereafter, this alone is not sufficient to demonstrate that any criminal activity is ongoing.  *See Sanders*, 59 4th at 237, 239 (stating that "a search warrant application must show more than that a person connected with a property is suspected of a crime").  Finally, the Affidavit does not provide any other evidence supporting the belief that narcotics, drug paraphernalia, drug documents, and/or drug proceeds are stored inside the Residence.

---

[7]   While this Affidavit does not mention any drug transactions occurring inside the residence, it is worth noting that, in *Baylis*, the affidavit did state that the defendant was believed to be selling crack cocaine from inside the residence despite not residing there, and this was still not enough to demonstrate the nexus between the place to be searched and the evidence sought because there was no evidence that the defendant stored the drugs there or would be at the residence at the time the warrant was executed.  2009 WL 454344 at *13-*15.

[8] This list of drug-related activities that may provide a nexus between the place to be searched and the evidence sought is not exhaustive; however, as the Affidavit only discusses limited suspicious activities at 3316 Bestway Drive, this list provides sufficient guidance on the type of activities that could give rise to such a nexus and how they are weighed in the probable cause analysis.

Defendant argues that *Sanders*, which was decided one day before the hearing on the instant motion, provides significant guidance here.[9]   In *Sanders*, officers presented a search warrant affidavit stating that a confidential informant advised that the defendant was "selling heroin/fentanyl from an apartment located on Yellowstone Parkway in Lexington, Kentucky." *Id*. at 235, 238.  The affidavit contained no information pertaining to the reliability of the confidential informant who provided the tip.  *Id*.  Acting on this information, an officer set up two controlled buys.  *Id*.  After the first controlled buy, the defendant drove directly from the location of the drug transaction to the Yellowstone Parkway apartment.  *Id*.  Similarly, for the second controlled buy, the defendant proceeded directly from the Yellowstone Parkway apartment to the designated location and the returned directly to the Yellowstone Parkway apartment.  *Id*.  Upon arrival at the Yellowstone Parkway apartment after the second drug transaction, the defendant exited his vehicle and entered the apartment.  *Id*.   The *Sanders* court held that the affidavit failed to establish the requisite nexus between the place to be searched and the evidence sought for several reasons.  *Id*. at 238.  Of most relevance here, the court held that the affidavit failed to set forth the confidential informant's basis of knowledge that the defendant was selling drugs from the apartment.  *Id*. at 238-39.[10]

---

[9] As the *Sanders* case was decided on the eve of the hearing, the parties were permitted to submit supplemental briefing on the applicability of that case.  (*See* D.E. #33, #34).

[10]  The facts before the *Saunders* case may also be distinguished in several ways.  The most glaring is that the affidavit in that case contained no evidence whatsoever of the confidential informant's veracity or reliability, whereas the Affidavit here does provide that the CS assisted in two felony narcotics seizures. While that fact makes the confidential informant's information in *Sanders* worth significantly less weight, there are facts in *Saunders* that then weigh stronger in favor of probable cause.  Most notably, on three occasions, the defendant travelled directly to or from the apartment to engage in a drug transaction, and on one occasion, the defendant entered the apartment immediately after the drug transaction.  *Id*.  Here, while the probable cause buys did occur at 3316 Bestway Drive, there is no indication whether Defendant entered or exited the Residence at any point near in time to those transactions.

16

The Court agrees that *Sanders* is highly analogous to this case. As in *Sanders*, because the Affidavit does not set forth any evidence that drug-related activity, including sales or storage, is occurring inside the Residence, it cannot be said that that an activity-focused nexus exists here. Accordingly, as the Affidavit does not provide sufficient evidence of the requisite nexus, it is RECOMMENDED that the Search Warrant for the Residence located at 3316 Bestway Drive in Memphis, Tennessee was not supported by probable cause because it did not articulate a fair probability that contraband or evidence of a crime would be found inside the Residence.

### b. Whether the Search Warrant was Relied Upon in Good Faith

Even if a search warrant were issued without probable cause, suppression of the evidence is not the automatic remedy. *United States v. Leon*, 468 U.S. at 913-21. If officers were acting in objectively reasonable reliance on a search warrant that is subsequently invalidated, the good-faith exception to the exclusionary rule applies such that the evidence may be introduced despite the magistrate's error. *Id.*; *see also United States v. Laughton*, 409 F.3d 744, 748-49 (6th Cir. 2005); *United States v. Savoca*, 761 F.2d 292, 295-98 (6th Cir. 1985).[11]

The *Leon* court identified four circumstances when officers' reliance upon a search warrant is not objectively reasonable. *Laughton*, 409 F.3d at 748 (citations omitted). The first circumstance is when the warrant is issued on the basis of an affidavit that the affiant knows, or is

---

[11] Under *Leon*, the Court is not limited to the four corners of the Affidavit when considering whether the Search Warrant was sought and executed in good faith; instead, the Court should consider "all of the circumstances" of the officers' conduct in making this determination. *Frazier*, 423 F.3d at 534 (quoting *Leon*, 468 U.S. at 923 n.23).

In considering all evidence before the Court, the record reflects that, during his post-arrest statements, Defendant did identify the Residence as being his house. (Feb. 7, 2023 Hearing, Exhibit 1, at 0:01:36-0:02:04, 0:07:35-0:07:37). However, there is no evidence in the record that either Detective Young or any other SCSO officers had any evidence to corroborate that Defendant in fact resided there before obtaining the search warrant and executing it.

reckless in not knowing, contains false information, the good-faith exception does not apply.  *Id.*; *see United States v. Abernathy*, 843 F.3d 243, 257-28 (6th Cir. 2016) (citing cases).

The second is when the issuing magistrate judge abandons his or her neutral and detached role and "serves as a rubber stamp for police activities." *Laughton*, 409 F.3d at 748.  Examples of such conduct are if the magistrate fails to read and review it or relies upon unsworn testimony. *See, e.g.*, *United States v. Frazier*, 423 F.3d 526, 537 (6th Cir. 2005).  The burden rests with the defendant to prove that the magistrate acted as a "rubber stamp."  *Id.* (citing *United States v. Rodrigues-Suazo*, 346 F.3d 637, 649 (6th Cir. 2003)).

The third is when the affidavit is "so lacking in any indicia of probable cause that a belief in its existence is objectively unreasonable." *Laughton*, 409 F.3d at 748.  This is also known as a "bare bones" affidavit, and it is commonly defined as one that states only "'suspicious, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.'"  *Id.* (citing *United States v. Weaver*, 99 F3d 1372, 1378 (6th Cir. 1996)).  Put otherwise, it is a "conclusory affidavit" that asserts only the affiant's belief that probable cause existed and is completely devoid of facts to support that conclusion.  *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (citing *United States v. Williams*, 224 F.3d 530, 533 (6th Cir. 2000); *Carpenter*, 360 F.3d at 595-96).

The fourth is when the warrant is "so facially deficient that it cannot reasonably be presumed to be valid." *Laughton*, 409 F.3d at 748 (citations omitted).  Examples of facially deficient warrants include ones that fail to particularize the place to be searched or the items to be seized.  *Leon*, 468 U.S. at 923.  If a warrant is facially deficient, even a cursory reading of the warrant—and perhaps just a simple glance—would have revealed "'a glaring deficiency that any reasonable police officer would have known was constitutionally fatal.'" *United States v. Linda*

*Roos*, No. 12-09-ART, 2013 WL 1136629, at *3 (E.D. Ky. Mar. 18, 2013) (citing *Groh v. Ramirez*, 540 U.S. 551, 564 (2004)).

At issue here is the third circumstance, which requires the Court to analyze whether, even if the Affidavit is found not to have been supported by probable cause, it contained sufficient evidence such that reliance upon it was objectively reasonable. To establish that the officers reasonably believed the Affidavit was sufficient, the required showing is "less demanding than the showing necessary to establish probable cause." *United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004); *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004). When an affidavit is found to be lacking adequate evidence of the nexus between the place to be searched and the evidence sought, it must still contain a "minimally sufficient nexus between the illegal activity and the place to be searched" for the good-faith exception to apply. *United States v. White*, 874 F.3d 490, 497 (6th Cir. 2017) (quoting *Carpenter*, 360 F.3d at 596)).

Here, the Court cannot find such a minimally sufficient nexus. While the Affidavit provides concrete evidence that Defendant is selling narcotics at 3316 Bestway Drive and warranted suspicion regarding what is taking place within the Residence, there remains no evidence as to any basis that evidence of illegal activity would be found there. As the "chief evil" of the Fourth Amendment is the physical invasion of the home, *see United States v.* Brown, 828 F.3d 375, 381 (6th Cir. 2016), it is RECOMMENDED that the lack of any evidence of what might be found there renders reliance upon the Search Warrant objectively unreasonable. Thus, it is RECOMMENDED that the search performed pursuant to the Search Warrant was done in violation of the Fourth Amendment.

### c. *Whether Defendant's Post-Arrest Statements Were Made Knowingly, Intelligently, and Voluntarily*

Finally, Defendant argues that his post-arrest statements were elicited in violation of the Fifth Amendment to the United States Constitution and *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). Specifically, Defendant argues that his statements were not made voluntarily because he was not asked about his present mental health or any prior mental health treatment, he was not asked whether he was under the influence of any intoxicating substances despite being under arrest for narcotics offenses, and he was not asked about his education level or whether he could read or write. Defendant further suggested at the hearing that Detective Young spoke so rapidly that it was difficult for the statements that were provided to be understood.

The Fifth Amendment prohibits an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Under *Miranda*, an individual who is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning" must be provided information on the following "[p]rocedural safeguards" to protect his privilege against self-incrimination:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

384 U.S. at 479; *see also Duckworth v. Eagan*, 492 U.S. 195, 201 (1989).

A suspect may elect to waive his *Miranda* rights if the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 444. The inquiry into whether a proper waiver was made has "two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of

20

comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).  The government bears the burden of demonstrating by a preponderance of the evidence that the *Miranda* warnings were properly provided and that a suspect voluntarily, knowingly, and intelligently waived his rights.  *Miranda,* 384 U.S. at 479; *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Upon review, the record reflects that Defendant was provided his *Miranda* rights on two occasions, one of which was recorded on audio and is part of the record.  There is no evidence as to how quickly Defendant was provided his *Miranda* rights on the first occasion; however, on the second occasion, they were provided in a rapid fashion such that it would have been extremely difficult for Defendant to have appreciated them.  (Feb. 7, 2023 Hearing, Exhibit 1, at 0:00:33-0:01:18).  When asked if he wishes to answer questions, his answers are unintelligible, although one detective mentions that Defendant was shaking his head, which is concerning as that gesture is frequently used to indicate that someone either does not wish to proceed or is uncertain about doing so.  (*Id.*)  Defendant also repeatedly expresses concern about why the interview is being recorded.  (*Id.*)

The record further reflects that Defendant was given the opportunity to read his rights and follow along on a paper on the first occasion and that he was provided the Rights Waiver Form on the second occasion, which he initialed and signed.  Even so, the record reflects that Defendant was never asked about his education level or his abilities to read or write, and it does not contain any further evidence as to whether Defendant would have been able to read the Rights Waiver Form.  Thus, his signature and initials on it carry significantly less weight in considering the totality of the circumstances.

As to what questions Detective Young asked before conducting the interview, the record reflects that Defendant was not questioned about the topics of mental health or intoxication. However, it also reflects that Detective Young observed that Defendant "seemed pretty normal," that he did not ask any questions about where he was or what was happening, that he did not appear confused, that he indicated that he wanted to speak to Detective Young, and that he responded in a straightforward and responsive manner.

Here, when taken together, his *Miranda* rights were read very quickly on one occasion and at an unknown pace on the other, it is unknown whether Defendant could read or write, and it is unknown whether Defendant was intoxicated or impaired by any mental health issue. The Government may have been able to meet its burden if only one or two these facts were the case. *See, e.g.*, *Clark v. Mitchell*, 425 F.3d 270, 283-84 (6th Cir. 2005) (citing *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989) (stating that "[e]vidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process"); *Michael G. Upshaw v. Warden Glen Turner*, No. No. 05-2097-JPM-dkb, 2007 WL 1757255, at *8 (W.D. Tenn. Apr. 30, 2007) (stating that a defendant's purported diminished literacy, alone, is insufficient to invalidate a waiver of his *Miranda* rights); *United States v. Michael L. Tucker*, No. 2:06-CR-03, 2006 WL 1207972, at *4 (S.D. Ohio Apr. 28, 2006) (noting that a quick recitation of a defendant's *Miranda* rights weighs against the subsequent statement being made voluntarily).

Yet, here, given the list of reasons of potential barriers to a knowing, intelligent, and voluntary waiver plus the inherently coercive nature of questioning at a police station, *see United States v. Protsman*, 74 Fed. Appx. 529, 533 n.6 (6th Cir. 2003); *Mitchell*, 425 F.3d at 238 (requiring

22

some element of coercive police activity to deem a confession as involuntary), it is RECOMMENDED that the Government has not met its burden of establishing that Defendant's statements were obtained consistent with the Fifth Amendment.

### IV.    Conclusion

For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress be GRANTED.

**SIGNED** this 11th day of April, 2023.

s/ Charmiane G. Claxton
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT.  28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**