**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                 **Case 2:22-cr-20154-JTF**

**IAN HERRON,**

        **Defendant.**

---

**AMENDED REPORT AND RECOMMENDATION ON**
**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

---

Before the Court is Defendant Ian Herron's Motion to Suppress.  (Docket Entry ("D.E.") #27).  The United States Magistrate Judge has previously entered a Report and Recommendation on the instant motion.  (D.E. #35).  The initial Report and Recommendation relied heavily upon a Sixth Circuit guidance in *United States v. Sanders*, 59 F.4th 232 (6th Cir. 2023).  Since the entry of the Report and Recommendation, the Sixth Circuit granted *en banc* review of the questions presented in *Sanders* and issued its *en banc* opinion.  This Amended Report and Recommendation reconsiders Defendant's Motion to Suppress in light of the *Sanders*' court's *en banc* opinion.

### I.    Background

For purposes of clarity, it is noted that neither the relevant background pertinent to Defendant's Motion to Suppress nor the evidence before the Court has changed since the entry of the initial Report and Recommendation; however, it is restated here.

### a. Indictment

On June 30, 2022, a grand jury of this Court returned a four-count Indictment against

Defendant charging him with committing the following offenses on or about July 6, 2021:

> Count One: unlawfully, knowingly, and intentionally possessing with the intent to distribute a controlled substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);

> Count Two: knowingly possessing a firearm, that is, a Ruger .44 caliber revolver handgun, in furtherance of a drug trafficking crime in violation of Title 18, United States Code, Section 924(c)(1)(A);

> Count Three: knowingly possessing a firearm, that is, a Ruger .44 caliber revolver, while knowing that he had been convicted of a crime punishable by imprisonment for a term exceeding one year, said firearm having been shipped and transported in interstate commerce, in violation of Title 18, United States Code, Section 922(g)(1).

> Count Four: knowingly possessing a firearm, that is, a F.I.E. Titan Tiger .38 caliber revolver, while knowing that he had been convicted of a crime punishable by imprisonment for a term exceeding one year, said firearm having been shipped and transported in interstate commerce, in violation of Title 18, United States Code, Section 922(g)(1).

(D.E. #1).

On January 22, 2023, Defendant filed the instant Motion to Suppress Evidence. Therein,

Defendant requests that this Court suppress all "evidence seized during and after an arrest,

interrogation, and the service of a defective search warrant, including without limitation all

statements attributed to Mr. Herron and all evidence seized and all evidence subsequently obtained

as a result of that seizure." (Def.'s Mot. at Suppress at PageID 31).

As bases for the suppression, Defendant argued that the Search Warrant was not supported

by probable cause and that no reasonable officer could have believed in good faith that it was a

valid search warrant. Additionally, he argued that the Government had not met its burden of

proving that he knowingly, voluntarily, and intelligently waived his rights. Specifically,

Defendant asserted that Detective Young did not inquire about his mental state or capacity, did not inquire about his ability to read or write, and did not inquire as to whether he was under the influence of controlled substances despite the alleged offense being narcotics related.

In its Response, the Government contended that the Search Warrant was supported by probable cause and that, even if it were found to be lacking in probable cause, it was relied upon in good faith pursuant to *United States v. Leon*, 468 U.S. 897 (1984). The Government further asserted that Defendant's *Miranda* waiver was voluntarily, knowingly, and intelligently made.

Following the hearing on the instant motion, both Defendant and the Government submitted post-hearing briefs on the applicability of *United States v. Antwone Sanders*, Case No. 21-5945 (6th Cir. Feb. 6, 2023), which was decided by the Sixth Circuit on the day prior to this hearing being held. Defendant argued that the *Sanders* panel decision was highly analogous and should guide the result in the instant case. The Government argue that the Search Warrant in this case contained greater indicia of probable cause such that the totality of the circumstances supported its issuance by the magistrate and the good faith reliance thereupon by the officers who executed it.

## II.    Proposed Findings of Fact

### a.    Residential Search Warrant

On July 2, 2021, Detective Stephen Young ("Detective Young") of the Shelby County Sheriff's Office ("SCSO"), Narcotics Division, sought a search warrant for the person of Defendant and a residence located at 3316 Bestway Drive, Memphis, Tennessee, 38118 (the "Residence").[1] (D.E. #27-1, #30-1). The Affidavit for Search Warrant ("Affidavit") stated that it

---

[1] For purposes of this motion, the term "Residence" will be used to refer to the interior of the home located at 3316 Bestway Drive in Memphis, Tennessee. The term "Premises" will be used to refer to all other areas on the property, including the unspecified location where the Chevrolet Impala was parked. The address 3316 Bestway Drive will refer to the entire property, including both the Residence and the Premises.

sought to locate fentanyl, marijuana, drug paraphernalia, drug documents, drug proceeds, and electronic storage devices. (*Id*.) Therein, Detective Young provided the following information.

In June 2021, detectives with the SCSO Narcotics Division received information from a confidential source ("CS") that a black male by the name of Ian Herron was selling narcotics in the Memphis, Shelby County, Tennessee area. (D.E. #27-1 at PageID 43; D.E. #30-1 at PageID 70). Using law enforcement databases, detectives were able to positively identify Defendant through the use of photographs that were provided to the CS. (*Id*.) The CS additionally "provided information to Narcotics Detectives that has been verified independently and resulted in two felony narcotics seizures." (*Id*.)

The CS advised detectives that Defendant had been selling fentanyl from "his residence" located at 3316 Bestway Drive in Memphis, Tennessee. (*Id*.) Detectives conducted intermittent surveillance at the Residence, during which time they observed Defendant "sit in the front seat of a white Chevrolet Impala with numerous unknown subjects at the residence." (*Id*.) They also observed that Defendant would "briefly enter the residence and encounter the unknown individuals resulting in the unknown subjects leaving the residence shortly thereafter." (*Id*.) Detective Young stated that, based upon his three-and-a-half years of law enforcement experience, he was aware that these types of encounters and exchanges are consistent with narcotics trafficking. (*Id*.)

Detectives additionally relied upon the CS within five days of July 2, 2021 to perform probable cause ("PC") buys from Defendant at 3316 Bestway Drive, where SCSO narcotics funds were exchanged for fentanyl. (*Id*.) Detective Young further stated that, "[t]hrough training and experience[,] drug dealers are known to keep drugs, drug paraphernalia, drug documents and drug proceeds inside their residence." (*Id*.)

On that same day, a search warrant (the "Search Warrant") was issued for the person of

Defendant Young and the Residence.  (D.E. #27-1 at PageID 41; D.E. #30-1 at PageID 68).  The

Search Warrant was returned executed on July 6, 2021.  (D.E. #27-1 at PageID 42; D.E. #30-1 at

PageID 69).  The Search Warrant return information indicates that officers obtained 177 grams of

fentanyl, 75 grams of THC gummies, a digital scale, two (2) firearms, and "assorted ammo."  (*Id*.)

### b.  *Detective Stephen Young's Testimony and Hearing Exhibits*

At the hearing on the instant motion, Detective Young testified as the case agent regarding

the execution of the Search Warrant for the Residence, the detention of Defendant, and his

subsequent questioning.

Detective Young stated that between six and eight law enforcement officers were present

at the search of the Residence.  Detective Young encountered Defendant at the Residence, at which

point he was handcuffed and detained in an unmarked car while the search was performed.  The

search itself lasted approximately thirty to thirty-five minutes.  While Defendant was detained,

Detective Young advised him that they had a search warrant for the Residence and that he was the

target of the investigation.  Detective Young did not advise Defendant of his *Miranda* rights at that

time and did not ask him any questions or try to elicit any information from him.

Defendant was then transported to an SCSO office, which took approximately ten minutes.

When he arrived, Detective Young advised Defendant of his *Miranda* rights as he entered the

building.  Detective Young did so by reading the *Miranda* warnings from the SCSO advisory form,

which is his standard procedure.  Detective Young also has the individual sign an SCSO Narcotics

Division Miranda Rights Advisement / Waiver Form ("Rights Waiver Form"), which Defendant

did.  (*See* D.E. #30-2).  The Rights Waiver Form states as follows:

> You are going to be asked some questions regarding this investigation.  You have
> the right to remain silent and anything you say [may] be used against you in a court

of law.  You have the right to have a lawyer present, either of your own choice, or court appointe[d.  If] you are unable to afford one, and to talk to your lawyer before answering any questions, and to have a lawyer with you duri[ng] questioning if you wish.

(D.E. #30-2).  It further asks two questions: "Do you understand each of these rights I have explained to you?" and "Having these rights in mind, do you wish to answer questions at this time?"  (*Id.*)  Both questions have handwritten responses of "Yes IH."  The form appears to be signed by Defendant and two witnesses.  (*Id.*)

Defendant was next taken to a holding cell and then to an interview room.  In the interview room, Defendant was again advised of his *Miranda* rights, and this advisement of rights was audio recorded.  (Feb. 7, 2023 Hearing, Exhibit 1, at 0:00:00-0:01:18).  During this recorded reading of his rights, Detective Young stated that he had already advised Defendant of these rights previously.  (*Id.*)  Detective Young asked Defendant to acknowledge that, but his response on the audio recording is unintelligible.   (*Id.*)  Detective Young then asked if Defendant wished to answer questions at that time.  (*Id.*)  His response is again unintelligible, although one detective mentions that Defendant was "shaking his head."  (*Id.*)   Detective Young testified, though, that he recalls Defendant indicating that he wished to speak to him and Detective Towns.  Detective Young testified that Defendant did then speak with then, and the audio recording reflects the same.  (*Id.* at 0:01:18-0:17:46).  Detective Young testified that he does not believe that Defendant asked any questions about his *Miranda* rights but that, if he had, he would have answered them.   At no time did Defendant state that he wished to stop speaking with them.  (Feb. 7, 2023 Hearing Transcript, Exh. 1, at 0:00:00-0:17:46).

Detective Young did not ask Defendant if he could read or write, if he was under the influence of any controlled substance, or if he had any mental health history.  Detective Young testified that Defendant "seemed pretty normal," did not ask any questions about where he was or

what was happening, did not appear confused, and responded in a straightforward and responsive manner.  Detective Young testified, however, that he had never met Defendant before and did not have any baseline for his behavior.

Detective Young testified that the interview lasted approximately fifteen to twenty minutes; the audio recording reflects that it lasts seventeen minutes and forty-seven seconds.  Detective Young did not prepare a written statement to be signed by Defendant, but, instead, relied upon the audio recording of the interview.  Detective Young concluded the interview at that time and does not recall engaging in any further conversations with Defendant.

### III.    Amended Analysis

#### a.    *Whether the Search Warrant was Supported by Probable Cause*

The Fourth Amendment guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U. S. Const. amend. IV.  The task of a magistrate from who a warrant is sought is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal quotation marks omitted).

"The critical element of a reasonable search is . . . that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought."  *Zurcher v. The Stanford Daily*, 436 U.S. 547, 556 (1978) (internal quotation marks omitted).  This is typically referred to as the "nexus" between the place to be searched and the evidence desired to be found.  *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2003).  This

7

connection between the evidence and the criminal activity must be "specific and concrete, not 'vague' or 'generalized.'"  *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2013) (quoting *Carpenter*, 360 F.3d at 595).

If the affidavit includes hearsay from a confidential informant, the reviewing court "must consider the veracity, reliability, and the basis of knowledge for that information as part of the totality of the circumstances for evaluating the impact of that information."  *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003).  These three elements should not be understood as entirely independent requirements to be rigidly exacted in every case.  *United States v. Smith*, 358 U.S. at 477-478 (citing *Gates*, 462 U.S. at 230).  Instead, they should be understood as closely intertwined considerations that may inform the determination of whether an informant's tip establishes probable cause.  *Id.*

In assessing the reliability of a confidential informant's tip, a deficiency in one of these areas generally may be compensated for by a strong showing as to the other, or by some other indicia of reliability.  *Smith*, 358 U.S. at 478 (citing *Gates*, 462 U.S. at 233).   However, there is one requirement that the Sixth Circuit has held must be met to rely upon a confidential informant's tip without independent corroboration, and it pertains to the informant's basis of knowledge that evidence will be found at the place to be searched.  Specifically, "[w]hen an informant has a proven track record for providing reliable information, corroboration of the information he provides is not necessarily essential, *as long as there is sufficient indication of his basis of knowledge for concluding that contraband or evidence of a crime will be found in a particular place.*"  *Smith*, 182 F.3d at 479 (italics added); *see also Draper v. United States*, 358 U.S. 307, 313 (1959).

Although reasonable minds may differ on the question of whether an affidavit establishes probable cause, reviewing courts should afford the issuing magistrate's determination "great

deference," *United States v. Leon*, 468 U.S. 897, 914 (1984) (citation omitted), "an issuing magistrate's decision should only be reversed if it was arbitrarily exercised," *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (citing *United States v. Swihart*, 554 F.2d 264, 270 (6th Cir. 1977)).    The review of whether a warrant was supported by sufficient evidence is limited to the four corners of the affidavit, *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010), and it "must be judged based on the totality of the circumstances, rather than line-by-line scrutiny," *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006).    Ultimately, the Government bears the burden of demonstrating that a warrant is supported by probable cause.    *United States v. Abboud*, 438 F.3d 554 (citing Fed. R. Crim. P. 41(c); *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996)).

It its *en banc* opinion in *Sanders*, the Sixth Circuit restated that there is "no model fact pattern" for determining when evidence of illegal drug activity will be located inside a residence, but it did summarize several overarching categories of cases that illustrate the type of direct or circumstantial evidence needed to support a finding of probable causes.    Two principles from these case are central to dictating the result here.

First, the *Sanders en banc* court stated that "a credible informant's tip of criminal activity occurring in *or directly outside* of the location of the search" is direct evidence of probable cause.    *Sanders*, — 4th — (2024) (citing cases).    Here, the Affidavit contained significantly more support, as multiple controlled buys actually occurred at 3316 Bestway Drive.    The Affidavit also demonstrated the informant's credibility by explaining that the individual had provided information that had resulted in two other felony narcotics seizures.    *See id.* (finding an informant "quite credible" when the individual has already been "proven twice right.").

Second, the *Sanders en banc* court stated that, when a defendant both resides at the location to be searched and actively engages in certain criminal activity there, officers have demonstrated more than the "mere suspicion" required that he may keep instrumentalities and fruits of the crime in the residence. *Id*. (citing cases). Otherwise stated, "no training is required to reach [the] commonsense conclusion" that those engaging in illegal drug activity must have a place of business to "mix and measure the merchandise, protect it from competitors, and conceal evidence of their trade—such as drugs, drug paraphernalia, weapons, written records, and cash—in secure locations," and "drug dealers don't tend to work out of office buildings." *Id*. (citing *United States v. Spencer*, 350 F.3d 1003, 1007 (D.C. Cir. 2008). Here, the informant identified 3316 Bestway Drive as Defendant's residence,[2] and detectives confirmed that he was engaging in criminal activity at 3316 Bestway Drive through multiple controlled buys. Detectives also performed surveillance at 3316 Bestway Drive and observed conduct consistent with drug transactions.

Ultimately, the *Sanders en banc* court concluded that "the warrant established a probable cause nexus [through] . . . two controlled buys with direct connections to the [place to be searched] along with a credible tip." *Id*. For similar reasons here, as detailed above, it is RECOMMENDED that the Search Warrant was based upon probable cause and, thus, that the search executed in reliance upon it complied with the Fourth Amendment.

### b. Whether Defendant's Post-Arrest Statements Were Made Knowingly, Intelligently, and Voluntarily

---

[2] In the initial Report and Recommendation, the Court applied a higher bar to the Affidavit and specifically to its assertion that Defendant did in fact reside at 3316 Bestway Drive. The *Sanders en banc* court cautioned against applying too high of a bar to the probable cause determination and instead instructed courts to focus on what an affidavit contains rather than what it lacks. *Id*. Thus, even though the Affidavit did not provide further evidence supporting the assertion that 3316 Bestway was Defendant's residence, its statement that a credible informant identified it as such has legitimate weight in the probable cause analysis.

The *Sanders* court's *en banc* opinion does not alter the Magistrate Judge's earlier recommendation on Defendant's Fifth Amendment challenge. That earlier recommendation is restated here.

Defendant argues that his post-arrest statements were elicited in violation of the Fifth Amendment to the United States Constitution and *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). Specifically, Defendant argues that his statements were not made voluntarily because he was not asked about his present mental health or any prior mental health treatment, he was not asked whether he was under the influence of any intoxicating substances despite being under arrest for narcotics offenses, and he was not asked about his education level or whether he could read or write. Defendant further suggested at the hearing that Detective Young spoke so rapidly that it was difficult for the statements that were provided to be understood.

The Fifth Amendment prohibits an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Under *Miranda*, an individual who is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning" must be provided information on the following "[p]rocedural safeguards" to protect his privilege against self-incrimination:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

384 U.S. at 479; *see also Duckworth v. Eagan*, 492 U.S. 195, 201 (1989).

A suspect may elect to waive his *Miranda* rights if the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 444. The inquiry into whether a proper waiver was made has "two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it
> was the product of a free and deliberate choice rather than intimidation, coercion,
> or deception.  Second, the waiver must have been made with a full awareness of
> both the nature of the right being abandoned and the consequences of the decision
> to abandon it.  Only if the "totality of the circumstances surrounding the
> interrogation" reveal both an uncoerced choice and the requisite level of
> comprehension may a court properly conclude that the *Miranda* rights have been
> waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).  The government bears the burden of demonstrating

by a preponderance of the evidence that the *Miranda* warnings were properly provided and that a

suspect voluntarily, knowingly, and intelligently waived his rights.  *Miranda,* 384 U.S. at 479;

*Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Upon review, the record reflects that Defendant was provided his *Miranda* rights on two

occasions, one of which was recorded on audio and is part of the record.  There is no evidence as

to how quickly Defendant was provided his *Miranda* rights on the first occasion; however, on the

second occasion, they were provided in a rapid fashion such that it would have been extremely

difficult for Defendant to have appreciated them.  (Feb. 7, 2023 Hearing, Exhibit 1, at 0:00:33-

0:01:18).  When asked if he wishes to answer questions, his answers are unintelligible, although

one detective mentions that Defendant was shaking his head, which is concerning as that gesture

is frequently used to indicate that someone either does not wish to proceed or is uncertain about

doing so.  (*Id*.)  Defendant also repeatedly expresses concern about why the interview is being

recorded.  (*Id*.)

The record further reflects that Defendant was given the opportunity to read his rights and

follow along on a paper on the first occasion and that he was provided the Rights Waiver Form on

the second occasion, which he initialed and signed.  Even so, the record reflects that Defendant

was never asked about his education level or his abilities to read or write, and it does not contain

any further evidence as to whether Defendant would have been able to read the Rights Waiver

Form.  Thus, his signature and initials on it carry significantly less weight in considering the totality of the circumstances.

As to what questions Detective Young asked before conducting the interview, the record reflects that Defendant was not questioned about the topics of mental health or intoxication. However, it also reflects that Detective Young observed that Defendant "seemed pretty normal," that he did not ask any questions about where he was or what was happening, that he did not appear confused, that he indicated that he wanted to speak to Detective Young, and that he responded in a straightforward and responsive manner.

Here, when taken together, his *Miranda* rights were read very quickly on one occasion and at an unknown pace on the other, it is unknown whether Defendant could read or write, and it is unknown whether Defendant was intoxicated or impaired by any mental health issue.  The Government may have been able to meet its burden if only one or two these facts were the case. *See, e.g.*, *Clark v. Mitchell*, 425 F.3d 270, 283-84 (6th Cir. 2005) (citing *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989) (stating that "[e]vidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process"); *Michael G. Upshaw v. Warden Glen Turner*, No. No. 05-2097-JPM-dkb, 2007 WL 1757255, at *8 (W.D. Tenn. Apr. 30, 2007) (stating that a defendant's purported diminished literacy, alone, is insufficient to invalidate a waiver of his *Miranda* rights); *United States v. Michael L. Tucker*, No. 2:06-CR-03, 2006 WL 1207972, at *4 (S.D. Ohio Apr. 28, 2006) (noting that a quick recitation of a defendant's *Miranda* rights weighs against the subsequent statement being made voluntarily).

13

Yet, here, given the list of reasons of potential barriers to a knowing, intelligent, and voluntary waiver plus the inherently coercive nature of questioning at a police station, *see United States v. Protsman*, 74 Fed. Appx. 529, 533 n.6 (6th Cir. 2003); *Mitchell*, 425 F.3d at 238 (requiring some element of coercive police activity to deem a confession as involuntary), it is RECOMMENDED that the Government has not met its burden of establishing that Defendant's statements were obtained consistent with the Fifth Amendment.

## IV.    Conclusion

For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress be GRANTED IN PART AND DENIED IN PART.

**SIGNED** this 9th day of July, 2024.

s/ Charmiane G. Claxton
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE SAID OBJECTIONS OR EXCEPTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER AND/OR FORFEITURE OF THE OPPORTUNITY TO RAISE OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**